Case number 21-5282, CSL Plasma Inc. et al., at Balance v. United States Customs and Border Protection and Chris Magnus, Commissioner, U.S. Customs and Border Protection. Mr. Weiss for the at Balance, Mr. Yelling for the employees. Good morning. Council, you may proceed. Thank you, Your Honor. Baruch Weiss from Arnold and Porter representing the Plasma Collection Centers, CSL, Baring, and Griffles. These are international companies with subsidiaries in the U.S. that have set up these collection centers throughout the United States, but especially on the Mexican border. The court knows we are here to appeal the decision of the district court, which dismissed our complaint on zone of interest grounds. The Plasma Collection Centers had filed a complaint challenging the Plasma Collection ban that had been implemented by CBP back in June, a ban which had significantly exacerbated the already pre-existing pandemic shortage of blood plasma in this country. And the judge below dismissed the case on zone of interest grounds, finding that only American workers, but not American businesses, fell within the zone of interest. And since we were an American business, we could not bring this complaint. That is not the issue before this court. The reason it is not the issue before this court is on appeal, the government has conceded what it did not concede below, which is that some American businesses do fall within the zone of interest of the B-1 statutory provision of the Immigration and Nationality Act. And we, of course, are a business. So the issue now before the court is whether we, our businesses, fall within the zone of interest or not. More specifically, the government's position is that not every business falls within the zone of interest, but you have to be a business with an international nexus. And so the issue on appeal, which is now different than the issue before the district court, is whether or not to fall within the zone of interest such that you can bring a loss in challenging this ban. If you're a business, do you have to demonstrate an international nexus or can any business bring this kind of lawsuit to challenge this sort of plasma collection ban? Mr. Weiss, do we have to determine that any business could challenge this type of ban? I mean, even if we reject the government's sort of narrow international nexus test, do we, is the only other alternative for us to conclude that any business can challenge this? No, I don't think you'd have to, we'd have to say that any business can. In this case, I think it's easy. If you part with the international nexus, then I think it's very easy to say on the facts of this case, these businesses can bring this down. These businesses have invested millions and millions of dollars at the border to collect plasma from Mexican donors who crossed the border and have been crossing the borders for decades to donate as part of a procedure by which they get the fund. And we, by the way, disagree with the factual conclusion the government draws that we lack an international nexus. Our view is that an international nexus is not required, that we have a very sufficient stake to meet the zone of interest and the alignment of interest that the Supreme Court talks about in Patch Act. We also say that even if the court were to disagree with, and even if the court were to adopt the position of the government, we have the international nexus that is required. I don't think the court has to reach the question of whether, say, a business far away from the border in North Dakota that lost a sale of a candy bar because a Mexican was not allowed in would have the zone of interest that would be appropriate. So I don't think you have to reach that question. I think we're an easy case once you dispense with the international nexus, given the huge amounts of money, expenditure, employment effort that they put in to collect plasma. So is your argument in part that as to that legal question, there are no disputed facts, so there's no reason to send this back to the district court because normally if the government has conceded something, but it says there's another ground for affirming, the court might get to that. Understand that issue. The government said that even if it loses on the zone of interest, you can affirm on the merits. That was the argument that the government made in its appellate brief. What I'm suggesting to the court today is the issue, we're only focusing for a moment on the zone of interest, not even reaching the merits, which the court said you could reach on appeal. There is a pure legal issue. And the pure legal issue is this, when Congress used the word business in the relevant statute in the B-1 statutory provision of the Immigration and Nationality Act, when Congress said business, did it mean business? Or did it mean, well, business, except if it has an international nexus? That's a purely legal question, Your Honor, which I think you could determine on appeal and there's no need to remand to the district court to determine that purely legal question. And that is a question which we think is easily answered with the answer that business means exactly what you think it means. It does not have this different, special, unusual meaning that is imposed on it by the government. And we say that- Yes, Your Honor. So you're saying then that if we agreed with you that assuming such a nexus is required, you meet that. That, in other words, the import of the word business does not carry along. And if it does, you meet the requirement. But that could be the predicate for deciding not just that you are within the zone of interest, but rather that merits are to be resolved. Well, that is a good question, Your Honor. Normally, the zone of interest analysis and the merits are two entirely separate analyses. And they were entirely separate in the district court. In the district court, the analysis was, on the zone of interest, is it just American laborers or workers who could... And on the merits, the discussion didn't focus so much on the word business. It focused on a different word in the statute, on the word labor. The statute says you can come in for business unless it's labor. The statute says we want to open our doors for business, but we want to protect at the same time our local workers. And so in the district court, those were two distinct arguments. We talked about American workers as whether they can bring lawsuits in the zone of interest. And then we talked about the question of whether donating plasma is labor on the part of Mexican donors. We said, it's preposterous. It's not labor that you sit in a chair. The labor is done by the employees of the collection center who take it. But now on appeal, I think you're right, Your Honor. There is a convergence of the two normally distinct principles. The zone of interest, which takes up the question of whether or what does business mean, is also an important question in determining once we bring this lawsuit, once we're allowed to bring this lawsuit, whether on the merits, the government is right or wrong. And so there is- The merits of what? The merits of your motion for a preliminary injunction? The legal merits of our interpretation of the Immigration and Nationality Act, which is a predicate for the preliminary injunction. Now that- So you have other showings to make before you- Yes, yes, yes, yes, yes. If we want a preliminary injunction, we have to show public interest, which we think we've shown, given the shortage it did, that it's exacerbated in the desperate need. We also have to show a probability of success on the merits, and that's where this would tend to overlap. That's exactly right, yes, Your Honor. That's where it would overlap. So for example, if you were to rule that business means what Congress said it was, and Congress just used the word business, the regulation said it means activities of a commercial or professional nature, we think this is of a commercial nature because the Mexican comes in to donate for the $50. That sounds like very much a commercial transaction. I don't think the government contests that. I'm sure the government does not contest that. So if you reject their effort to inject the international nexus element here, then you've already disposed of a significant chunk of the merits, and when I say merits, the interpretation of the Immigration and Nationality Act provision. That's central to this case. As it bears on your application. Correct. Now, there are other parts of that statute that need to be interpreted, too. When it makes an exception for labor, when it says business can come in, but not if you're going to engage in labor, when CBP announced the plasma collection ban, they didn't rely on the word business. They relied on the word labor, and they said, oh, these are laborers, and they're coming in to engage in employment and labor in the United States by donating their blood. The government on appeal does not claim that that interpretation ties in to the zone of interest test. So that would be an analysis that would be done on the merits. The government claims that it's the business word that serves as the operative gatekeeper in determining the zone of interest. And so that's why I'm addressing my argument to government, to business, but I'm happy to talk about labor, too, because the statute says business, yes, labor, no, and we think we are business. We think we are not labor, and therefore that we fit squarely in the terms of the statute. I will ask this to the government lawyer as well, but I mean, are there any other places, where does the government find this international nexus test? I mean, is it just in this litigation? Is it in any other regulations? I want to address that. Let me, if the court permit me, I want to first talk about where it's not found in order to show where it is found. It's not found in the statute. The statute doesn't say it. It's not found in the regulation when the regulation talks about business. The regulation, I'll say parenthetically, does use the word local in describing the labor component. There's no geographical qualifier with respect to business. The regulation says business means an activity of a professional or commercial nature. Then when it says not labor, it says labor means local employment or labor for hire. So in our view, and this is going to answer your question, Your Honor, in a moment. In our view, there is no geographical analysis or international nexus analysis needed when you're looking at business. Statute doesn't do it, regulation doesn't. In some cases, but not all, the particular business may implicate labor. Sometimes people come in to engage in business that's not qualified. Some instances, yes, labor, and some instances you can't tell. If it is labor or possibly labor, then you have to determine whether it's local labor under the regulation because not all labor is prohibited, only local labor, but not internationally. So the international comes when the cases that deal with individuals who are coming to the United States under a B-1 business visa are engaging in something that looks a lot or might be labor. And then the cases say, well, this is labor. Is it excluded? But not all types of labor are excluded. It has to be local labor to be excluded. And we see this business seems to be an international business. So therefore the labor done with the business really can't be characterized as local labor. And those are judicial opinions? Those are mostly BIA cases. Those are mostly BIA cases. And so when they get caught up in talking about international is when they're grappling with the very specific instance when you have business and labor. And since only certain types of labor prevent a barrier to qualifying to a B-1, only local labor, that launches those cases into an analysis of whether it's international. So for example, they ask the question, what if you're a bus driver or train conductor going from Canada to the United States? You're engaged in labor, but is that local labor? And they say, well, it's part of an international business. So it doesn't seem like local. And you find that analysis time and time again. But that's not to say that I don't suppose that BIA says that, therefore, if it's non-local labor, it has to be internationally non-local. Correct. It doesn't spit, but what it does, you're right. But what it does say, oh, but we're looking at the labor here and it happens to be international and therefore it's not local. Right, but that's a little bit of a gap. Correct. A differential gap. Correct. But there is a lot of language in the BIA cases. Oh, this is international or this is international and therefore the B-1 is okay. And that is where the government's mistake comes from. The government, the geographical limitation is articulated only by the word local and only in conjunction with the word labor. The cases, the BIA cases, therefore look at cases as local or international. And they say it's international, therefore there's no bar to a B-1 visa. And then the government reads those cases as saying, ah, there has to be an international nexus. That's where it comes from. And what are the BIA cases to us? What are the BIA cases to you? Well, the government- Affirmative, perhaps? The government, at some point, I think, tries to argue that they're entitled to a certain amount of deference. In this case, I don't think so. I mean, these are pure determinations of law. They're not like promulgating a regulation, for example. So the government cites them. I don't criticize the government for citing them. I might criticize the government for misinterpreting them. Why is the case raising a similar issue before the BIA rather than the district court? Why does it? Well, the BIA will typically get a case when it's determining a case of a particular alien who's challenging something that's been done with his visa, like an exclusion proceeding. But here, we are representing American subsidiaries of these international businesses, and our remedy is to challenge it under the APA in court. I might add, of course, the court needs to take in mind, which the court knows, the very pro-plaintiff zone of interest standard. In other words, we have to be arguably right. The Supreme Court said that. It's presumptively reviewable. The benefit, this is all language from the court. The benefit of the doubt goes to the plaintiff here. It is not designed to keep cases from being reviewed. And I would add that, by the way, an adverse ruling, and then there's a language of the APA, which says, are you adversely aggrieved? Are you aggrieved or adversely affected? Excuse me. We are aggrieved and adversely affected. This has caused us a significant loss of business and a significant inability to live up to the requirements that we have in terms of the blood plasma supply, which it was a very serious shortage resulting from the pandemic. It was about a 20% decline because of the pandemic. And this has now come and exacerbated. This is yet another shortage on top of the prior shortage. Do we know whether the employees of your clients have been laid off as a result of the ban? So I do know the answer to that, Your Honor. And the reason I know the answer to that is after Judge Chutkin dismissed our case and we appealed to this court, reading her opinion, we filed another complaint with plaintiffs who are individuals, which include employees of the plasma collection centers, include donors, individual donors. And she said it was individuals. And we found individuals who were very interested in challenging plasma collection ban. And we brought a second lawsuit. And what- So the consequence of the plasma ban and the court's decision together is to disemploy American workers. Right, there are many American workers. We are going- This is a protection that they didn't really need. Correct, yes. Correct, we have, as part of the record there to demonstrate standing and so on, we've explained how because the Mexicans are such a significant percentage of the donors that we may have to close down a significant number of the sites and lay off a significant number of the workers. And so what has this plasma ban done? It's hurt us from a public health perspective. It's hurt us from an employment perspective. It's hurt us from an economic perspective because the Mexicans who cross the border would get this $50 and they would, for the $50, they would make purchases on the American side of the border. And it has significantly hurt the economies of the border communities where we're built. They don't have staff. They're not part of this lawsuit. That's not an issue that you have to reach. But it is relevant, Your Honor, on the preliminary injunction when you consider the public interest in the issuance of injunctions. You'll have to take that to the district. Correct, correct. But I'm saying it's not entirely relevant to the case. It may be irrelevant to the issuance to this particular. I see that I've run out of time. I was gonna catalog all the other reasons why there is no international nexus. Are they all in your brief? You can rely on the brief or I still have three minutes. Maybe I'll have an opportunity to address that on that. Thank you. All right, we'll hear counsel for aptly. Good morning, Your Honors. May it please the court. I'm Louis Yellen from the Department of Justice. I'm here today on behalf of US Customs and Border Protection. You're welcome to remove your mask if you want. Thank you, Your Honor. If it's okay with the court, I'll retain it. As long as we can hear you. Yes, Your Honor. If you have trouble, please, of course, do let me know. There are three issues that came up in the court's policy with the Plasma Company's counsel that I'd like to address. The focus of the inquiry, whose activity is at issue, the question that Judge Rao asked about the basis of the international nexus test and the deference point that the court asked. To begin, the focus of the inquiry in determining whose activity is relevant is the non-citizen. The statute authorizes visas for non-citizens visiting the United States temporarily for business. So the question is whether or not it's the alien who is engaging in business, not whether or not a third party down the line has some international business, but whether the alien, him or herself, is engaging in business. So if the counsel for the appellants is correct that there's a commercial transaction here, then both are engaged in business. I'm sorry, Your Honor? Then both parties to a commercial transaction are engaged in business. We're not disputing that it's a commercial transaction, Your Honor. The question is whether or not that transaction has a connection to international. Okay, so you're saying it's business? It's business, but it's not international. Yes, Your Honor. Now, the reason that we know that it's the employee, or excuse me, the alien, the non-citizen's activity, that's the focus. The matter of G case from the Board of Immigration Appeals, which we cite at 40, I think provides a very clear example, because in that case, the Canadian company, the employer, was unambiguously engaged in international commerce, yet the board held that the non-citizen's activity was not business for purposes of the B-1 statute. I can explain some of the details. In which case was that? What was the- Matter of G at page 40 of our- So what was that person doing? So this was an employee aboard Canada who lived in Canada. Oh, yeah, so he had a job. He had a job. Yeah, he was- So, but again, Your Honor, the reason that this case is important is it demonstrates that the focus is on the non-citizen's activity, not the company's activity. That's clear. Okay, I mean, in the sense that you have to enter to qualify for the B visa, right? But the question I'm trying to address, Your Honor, is whether or not the non-citizen's activity must be international, or whether the company's is sufficient. Opposing counsel referred to the fact that the companies are international, engage in international commerce. There's a case involving the sale of vegetables. Yes, Your Honor. So the vegetables are grown across the border, brought in and sold, and the person and their proceeds go home. Yes, Your Honor. How is that different than coming here, selling the plasma? The difference, Your Honor- Same day. The difference, Your Honor, is that there's a commercial undertaking in Mexico or in Canada. That is, in all of the cases in which the Board of Immigration Appeals held that that activity was incident to international commerce, the board determined that most of the employment was in Canada, that there was a commercial activity in Canada, and that the activity in the United States was the non-citizen's extension of that commercial activity across the border. In the case of donors of plasma, sellers of plasma, the sellers of plasma are not engaged in a commercial activity in Mexico with regard to the plasma. They don't have a business selling plasma. They just come to the United States and they sell their plasma here. That's the only commercial- Isn't that different from growing vegetables, say, in your own personal garden, right? I mean, you know, your body produces plasma. Maybe you, you know, maybe you grow zucchinis in your garden. In both instances, you take them across the border and sell them. There is no case that's held that this example of growing vegetables in your garden would be sufficient, and it would be inconsistent with the board decisions to say that that would be sufficient. So maybe take a step away from the BIA decisions, and can you tell me, based on the statute and the regulations, where this international nexus test comes from, where the business has to have an international nexus? I certainly will, Your Honor. Let me preface my answer by saying the Supreme Court has recognized in the Gura Gura that the board, excuse me, of Immigration Appeals interpretations of the statute are entitled to Chevron deference. So at least as a merits question, the board's interpretations actually do govern here. But responding- Well, they govern here if the statute is ambiguous. I mean, Chevron deference doesn't mean they just defer to the BIA. Since 1929 in the Carnot statute, the Supreme Court has recognized that the term business is ambiguous. They deferred to applicable regulations interpreting that statute. Similarly here- A different statute. I beg your pardon, Your Honor. Yes, exactly right. The predecessor to this, it had the same relevant language. It's the origin of the statute that is at issue in this case. But now directly answering Your Honor's question. You can tell from the context of the statute itself that the activity in B-1 is not purely domestic commercial activity. It has to be. There are numerous other provisions in 1101A-15 that highly regulate domestic business activity. And if business meant anything other than labor, as opposing counsel suggests, all of these provisions would be superfluous. We cite them on page 28. I'm happy to go through any of them, but if I might point out one, that's a particular salience. A- Can I just ask you a preliminary question? The way you described the BIA cases in Canada and Mexico, as I understood your explanation, you said most of the company's activity is not international. Suggesting to me that, well, that isn't a disqualifying requirement. Your Honor, if I said that, I misspoke. The point of the BIA- What did they say? It has to be? They said that the non-citizens activity had to be international. That is the focus was on the status of the non-citizens activity- I know, but what I'm trying to understand is we have this statute, and somebody who otherwise lives in Mexico has an opportunity only to come to this country to give us blood, and then gets paid for it and goes home. So you're saying even the association with a commercial activity in this country is not enough because the farmer or the Mexican citizen is not bringing his own vegetables in. He's latching on to a company's activity in this country that also has international aspects. Has the BIA ever dealt with that kind of situation? Yes, Your Honor. The matter of G case I previously referenced- I know that's the Canadian case, all right? And I understand the distinction, but I'm not sure. I mean, you likely read it more carefully than I, but I didn't understand them to say, absent that it wasn't as hard and fast to rule. Maybe I misunderstood. I'm sorry, Your Honor. There is not a Board of Immigration Appeals case which holds that the alien non-citizens conduct in the United States is V1 conduct in virtue solely of the company's international activities. So the BIA has not decided that question? No, the BIA, quite the reverse, has held that it must be the non-citizens conduct in the United States. That must be a necessary incident of international commerce, that this is the G case. No, but I understand that, but another way of looking at the facts here would be that, and I'm not saying this is the way the BIA would do it, but I just want to be clear about it, is the only reason a Mexican person is coming for this short period of time is to engage in a commercial activity of a U.S. business. That's right, Your Honor. It's to get paid by a U.S. business. And the relevant question under B1 is whether getting paid for the activity that the Mexican national is undertaking in the United States is business within the meaning of the statute at issue here. Now, I understand that, but I'm just trying to be clear that when Congress was talking about all of these other interests it was protecting, I mean, arguably any U.S. citizen could contribute plasma too, but they're not interested in doing so apparently for the amount of money this company is willing to pay. But there are other people who are. So the only way for this company to avoid a problem is to set up a center in Mexico? Your Honor, there might be other avenues that are available. The only thing- Well, for example, if it's set up centers in Mexico. I think there might be legal impediments to that in Mexico. I believe that selling plasma in Mexico is not permitted. That is selling, commercially selling plasma. So this company simply can't deal in North America. No, Your Honor, the only question is whether the current visa permits this sort of activity. We're not taking a position on whether there are other mechanisms by which Mexican nationals could come into the United States. The only question that we're addressing is whether this particular visa provision authorizes that. No, I understand that, but I'm just trying to understand how, I mean, this is such an odd situation. And that's what I'm trying to understand the agency's position, much less the government's position on appeal as opposed to where it was in the district court. And that almost makes me say, well, let's send it back to the district court and let it sort all of this out. Respectfully, Your Honor, and I could address this in a moment, the government's position did not radically change in the way that Plasma Company Counsel's suggested. Well, I think you haven't contested the fact that you have taken a different position, at least in part. I didn't think that was a dispute. Your Honor, we only had one filing in the district court and that filing- I don't care how many filings, but the point is you made one representation in the district court and your brief before us has qualified that somewhat. I didn't think that was in dispute. I think it's not critical, Your Honor. Respectfully, that's not how we view our filing below, but I don't think- Well, let me put it this way. Reading the district court's opinion, I didn't see any indication that she thought that argument was before her. Now, maybe I'm wrong. That may well be true, Your Honor. If I might get back to the subsection that I thought was helpful- Right, yes. I do have a, I have a question, Mr. Yellen. Could I just have him finish? I'm sorry. I'm sorry, Your Honor. Or was he finished? I was finished, Judge Rogers, unless you had further question for me. I apologize. No, I thought you wanted to get back to the subsection. Did you have something else to argue? Oh, I did. This was in response to Judge Rouse earlier. Thank you, Your Honor. Would you like me to refer to that or do you want me to take your question now, Judge Rouse? I guess I'm wondering if you disagree with Mr. Weiss's characterizations of the BIA decisions. He suggests that the international component has been discussed in the BIA opinions with respect to labor, not with respect to business. And so I'm wondering, I am not an expert in BIA decisions in this area. Maybe I will have to become one, but I'm wondering how you would characterize this. I think that is plainly incorrect, Your Honor. I would suggest the court look at the Muguan, excuse me, Muguan-Guerra decision. It was a Third Circuit decision analyzing a BIA decision, which involved a company that was created by a Kenyan national who was selling goods in the United States. The Neal decision involved a engineer providing engineering services in the United States. These are all things that could be classified as business in a broad sense. Getting back to the statutory question, though, that Judge Rouse asked earlier, if the court looked at A-15E, A-15E is a provision that authorizes a visa for a non-citizen to come to the United States to develop or direct the operations of an enterprise in which the non-citizen has substantially invested. But there's a qualification. That activity is permitted only if there's a reciprocal treaty between the United States and the foreign state of that non-citizen's nationality, permitting that business activity. If business meant what the Plasma Company Council says it meant, then that same non-citizen could come in under a B visa and engage in that very activity without the qualification. Now, this is true of all of the provisions that we cite at page 28 of our brief. All of those provisions would be rendered entirely superfluous if business meant any sort of business whatsoever. Those are all activities involving domestic commercial conduct, which Congress has heavily regulated and provided prerequisites for. And for that reason, because Congress has heavily regulated and identified the types of domestic commercial activity in which non-citizens may engage in the United States, business in the B-1 provision refers to business activity, commercial activity, having some international connection. Now, on the merits, the board decisions are absolutely clear on this point. They talk about the need for the non-citizen's activity to be a necessary, have a necessary incident to international commercial activity. The HERA case, which is a canonical case identifying this, interprets the State Department's regulation and the statute and says that the activity must be a necessary incident. The NEAL case does the same. The G case, every single one of the cases that we have cited and that opposing counsel has cited refer to the need for the activity, that is the non-citizen's activity, to have a necessary connection to international commerce. Mr. Chairman. I'm sorry. Did I understand your answer to Judge Rao earlier about the vegetable garden and the owner bringing the vegetables for sale in the U.S.? But that didn't qualify because that wasn't the vegetable gardener's business? Correct, because the vegetable gardener was doing that as, I'm assuming, and this is built into the hypothetical, was doing it either as a hobby in Mexico or doing it purposely to raise crops and sell them only in the United States. In the farmer cases- Let's just assume not that, that it's a family plot and they sell locally in Mexico and then they also sell in the U.S. at a better price, perhaps. That would likely be permissible, Judge, if you look at the K and B case, which the plasma company cite in their reply brief, that would be permissible if the predominant commercial activity occurs in Mexico. But where'd the predominance requirement come from? This is how the board has interpreted the term business. The board has said that for it to be international commerce, the majority of the work, the majority of the commercial activity has to be in the foreign state. And the activity in the United States has to relate to that foreign commercial activity, but it cannot be the predominant activity, that is the commercial activity in the U.S. This is exactly why the Third Circuit case, the BIA held that the non-citizen was not engaged in international commerce because there was not the international component. That is, there was not a Kenyan business anymore to which the commercial activity in the United States related. In all of the farmer cases, there are also cases involving the collection of scrap paper, cases involving the collection of firewood. In each of these cases, the board has determined that the predominant commercial activity was in Canada or Mexico, and that the U.S. activity was incident to that foreign commercial activity. I think earlier you said necessarily incident. The court, excuse me, the board has determined that the conduct, the phrase the board uses is a necessary incident to international commerce. Well, why is it necessary? I mean, if you couldn't sell them here, you'd have to sell them at a lower price abroad. So you're right, Your Honor. No, I think that focuses on the wrong question with respect. The question is whether the activity here is related in a necessary way to some form of international commerce. So just to give one example. Well, it's related. I don't understand how it's necessary. If I might give just one example, there are cases involving transportation of automobiles from Canada to the United States. The board held that unloading those automobiles is a necessary incident to the commercial activity of transporting them across the United States, I'm sorry, across the international boundary. Isn't that a question about labor, however, whether that person was performing labor? So labor, first I should say the regulatory term is local employment or labor for hire. That's a term of art. There's business on the one hand and local employment or labor for hire on the other hand. And if activity is permissible under B-1, it qualifies as business, regardless of a colloquial use of the term, that is it could involve labor. In fact, many of the cases do involve what we would commonly call labor like transportation, loading and unloading and so forth. Conversely, local employment or labor for hire is all of the impermissible activities. But that could include things that we do not colloquially call labor. For example, engineering, providing engineering services. It's a form to use the statutory term of skilledly. But to be clear, these are terms of art. And I think it's quite important that the court not just consider the colloquial uses, but focus on the way in which the Board of Immigration Appeals has interpreted those terms in light of the history of the statute and the regulations. Mr. Allen, if we rejected the government's international nexus, yes, then do the appellants win? Because you've conceded, the government's conceded that business can be within the zone of interest. So with respect to this question before us, I mean, if we reject your test, do they, I guess, what is the government's say fact specific reason why they're not within the zone of interest? So I think it's quite critical at this juncture to distinguish between the zone of interest and the merits question. If the court determined that there isn't an international connection requirement for the zone of interest, nevertheless, it's quite clear that the plaintiffs lose on the merits in light of the BIA's interpretations, which are entitled to this court's deference under AGURA-GURA, that the activity of the non-citizen does have to have a necessary incident, be a necessary incident to international commerce. Do you think we can split those things that there could be a different test for what's like within the zone of interest test and on the merits with respect to the meaning of a statutory term business? Absolutely, Your Honor. The zone of interest test is a more general test than the merits test. The zone of interest test asks whether or not a particular plaintiff has a cause of action under a statute. That is whether Congress intended for that plaintiff to be able to sue, but that's a different question from whether or not the plaintiff wins on the merits. The answer to that merits question is going to be more detailed of necessity. They're related, they're both merits questions involving an interpretation of the action under the statute, but the actual standard that applies is going to be more detailed. So it's quite possible that if a court determined that there isn't an international connection requirement for the zone of interest, nevertheless, in light of the board's long 50 year plus interpretation of the term, the non-citizen has to have engaged in activity that is a necessary incident to international law. Ms. Geale, my memory may be failing me here, but I'm trying to recall of a case in which Chevron deference was invoked on behalf of an agency not involved in the case. Your Honor may be thinking of the Rappaport case in which there were multiple agencies that administered a decision. Is that what- Well, if there's multiple agencies, I don't think there's any Chevron deference, correct? Well, in that case, the court so held. Yeah, but here you're asking us to defer to a position that the BIA has taken in other cases that are factually analogous, but not the same as this case. And we don't know out of their own mouths what they would say about this case. And you're asking us to defer to a sort of general principle. With respect, Your Honor, it's not a general principle. It's a principle that is directly derived from each of the BIA cases. If it's the case that the board has held, that it can come with- I'll take that point and still ask, are you familiar with any case in which the court has deferred to an agency's position when the agency isn't before the court? I'm not off the top of my head. I can certainly look to see if there are any in the form of the court. However- We're in the same spot there. Well- It counts either. But with respect, Your Honor, the board's interpretation of a statute is a binding interpretation of the statute regardless of its context. It doesn't have to be a party before the court for its interpretation to be afforded Chevron deference. Well, that's the question. That's the question. I'm aware of no legal requirement that would say that a court should not abide by an agency interpretation that's entitled to Chevron deference when the agency is not a party before the court, but should when the agency is a party before the court. That would lead to- The closest thing I can recall was a case involving primary jurisdiction, a doctrine that's no longer taught in the schools, in which the question involved whether the employer responded in the case was covered by the railroad retirement system or the social security system, which depended upon the interpretation of interstate carrier in the Interstate Commerce Act. And the Surface Transportation Board was not here. It was only the Railroad Retirement Board. And we held up the case for the company to seek an opinion from the relevant agency. Is that where we are here? I don't think so, Your Honor, because again, the principles that are quite explicit in the board cases apply in this case. If it is the case, let me just, if I might, try to connect the dots explicitly. If it is the case, as the government says, that the board has held that to be business within B1, the non-citizen must engage in activity that is a necessary incident to international commerce, then that principle applies of its own force and unambiguously to this case because- Here's my question. I understand the government's emphasis in terms of deference to the board, but is the government, I don't understand the government to be arguing that the board could not change its view in these circumstances involving, public health emergency, U.S. citizens are dying. I don't know. Maybe the board would stick with it and say it's up to Congress. But as I understand it, your argument is simply these other, what I'll call more typical activities with people who come into the United States and deal with a company that's here. But this is not exactly different. And I mean, it is different. And you're asking us to apply, I think a general principle, but who knows what the board might do in this case. And maybe it would stick where it is, but clearly this sort of public health emergency has caused all kinds of changes. And maybe you have to go back to Congress to get them, but I'm just, I wanna be clear how far the government's argument is taking it. Well, I guess I have a- I think Judge Rao's questions keep going to, show me something in a statute, at least some of her questions. And your response is, well, you owe deference to the BIA, even though it hasn't dealt precisely with this fact situation, but there's a principle that applies and that's the end of it. And so even if we were to adopt your position, is it your position that we could necessarily not hold, that the BIA could not reach another decision? And that's sort of hold an abeyance notion that was just floated. So a few thoughts in response, Your Honor. First, there's not a mechanism to send this question to the BIA. Well, that's for the court to decide, isn't it at this point? I just wanna know what the government's position is. Is it that the BIA, even if the company were to go before it tomorrow, could not reach a different conclusion in the fact situation, or it might just stick to its guns and that's it. But we don't know. So what I would say, Your Honor, is it would be inconsistent with 50 years of BIA jurisprudence. Well, so is this pandemic. I mean, when was the last pandemic that we had? It's more than 50 years ago. Your Honor, respectfully, the reason why this case is so different than others is because these particular individuals are not engaged in what's recognized as international commercial activity. I understand that, counsel. You won't give me a yes or no answer, I gather, so I'm not gonna pursue this. Well, I can't give you a yes or no answer, Your Honor, because there's not a mechanism for getting a question like this before the BIA. So the court is- Well, that's a legal conclusion, isn't it, counsel? Yes, Your Honor, but respectfully- It's not briefed. It's not briefed. No party has addressed it. No one has cited anything. So, you know, moving on from that, if we can't hold it in abeyance to give the company or maybe some of its employees and the patients who have filed another case before the district court could pursue it before the BIA, we don't know. Your Honor, the BIA hears cases involving the exclusion or inadmissibility of non-citizens. It does not- I get that, counsel, believe me. All right, I get your point, but let's move on. I just have one other question. Yes, Your Honor. I mean, it's the BIA, as you mentioned, and we know does do these individual adjudications. Are BIA decisions binding in this type of litigation where a party has challenged a general policy of a federal agency? I think the questions of law are, Your Honor. I think they do deserve deference. And I would say- You think they do, but are there cases that suggest that the BIA determinations deserve deference in this type of context, not in the context of another determination of a non, you know, of an alien challenging some admissions decision? I think this is related to Judge Ginsburg's question, and I'm not aware of cases addressing this one way or the other. What I would say as a matter of first principles is it would lead to somewhat potentially contradictory results if the BIA received deference on an interpretation of law in one context, but not in another context. Well, but the contexts are very different. I mean, does the BIA have rulemaking authority? No, Your Honor. The Supreme Court has held a bigger part of that. It doesn't have rulemaking authority. No, but it has adjudicative authority, and the Supreme Court has held an agura-gura that the BIA's interpretations of the INA received Chevron deference in its resolution, in its articulation of the law, in its adjudications. And those- Counsel, the Supreme Court has clearly recognized that an agency can change its interpretation and it can explain why and give reasons. So that's just not an answer. And that's what I think Judge Rao's question is trying to get you to understand and address. Just assume, you know, but you want to fight this battle that no one's fighting right now. I beg your honor's pardon. I don't mean to be fighting any battle. I'm only suggesting that the court has the law that's before it. No party has sought an opinion from the BIA, nor is there a mechanism for doing so. And I think that's repetitious. I think each judge has heard your answer. And I thought Judge Rao's question was trying to see if you could, were open to giving other than a repetitious response. I beg your pardon, your honor. Anything further? No, your honor. I would just encourage the court to look closely at the board's decisions and consider the principles there. And we think that it leads to a fairly clear decision in this case. Thank you. We'll take the case under advisement. So counsel for appellate. I would like to address a number of points that were raised by the government. One that stressed with some force that a non-citizen's activity must be international or at least predominantly international. He said that is something, a requirement that comes from the BIA and needs to be imported into the statute and the regulation. I'd like to address, and in addressing that, I think I'm also gonna be able to address some of the deference questions that seem to be a different issue, but that converge with this. The best way to understand that that position is incorrect is to look at the very specific examples that the government gives in its regulations and in the foreign affairs mandate of B1 qualifying cases. They give examples. Now the government has said there has to be an international nexus or at least a predominantly international nexus. If you look at the regs, 22 CFR 4131, the term business, it says, defines it as used in the B1 statutory provision, refers to conventions. I don't see a convention necessarily having an international nexus. Conferences, consultation. So somebody comes into this country for a consult, a business consult. There is no requirement here in the definition section in the examples that are given here to indicate that there has to be an international nexus. Another example that the same regulation gives. The regulation gives an example of somebody who cannot come under a B1, a construction work. That's the paradigmatic example of somebody who does not qualify B1. Why? Because although he's coming in for business, you're engaged in labor. But then the regulation says, but the supervisor of a construction worker can come in under a B1. Now, how does the supervisor of a construction site come in? It could be any construction site. It could be the tree house in my backyard. If you're the supervisor and not the laborer, you can come in under the B1. What international nexus is it? And that's the regulation. Then you look at the Foreign Affairs Manual, the FAM, which is essentially the equivalent of the regulation. And this is what instructs the State Department. Here are some examples of B1 business visas, it says. It says, if you're coming in to consult with business associates, if you're coming in to play golf for prize money, where's the international nexus there? If you come in, professional athletes, such as golfers and auto racers, if they're getting prize money, can come in, even though they're getting the prize money, under B1. If you're coming in to litigate, that's an example that the FAM gives. I don't see an international nexus. If you're coming in to undertake independent research, you get a B1. These are not my examples. These are the government's examples. These are what guide our consular officials as they decide whether or not to issue B1. If you come to participate in scientific, educational, professional, or business conventions, conferences, or seminars. These are some of the examples that they give. There is clearly no requirement of an international nexus in these examples. That then gets to the deference issue as well. Why? Because I don't read the cases clearly the way Mr. Yellen reads the case. I read them the way we said before, that they introduce this international idea because they're dealing not purely with business, but business versus labor. And they're trying to find as the label locally. But even if you would accept this reading, then what you have is you have very inconsistent positions being taken by the government. The government through the BIA, at least according to Mr. Yellen's reading, is saying there's an international nexus requirement. But the government is also saying through the regulations that the government promulgated. And the FAM that the government promulgated, it's giving examples where there's clearly no international nexus. When you have those confusing messages from the government, I don't think they're confusing, but if you accept Mr. Yellen's reading, then it is clear that there was no Chevron deference, there's no Skidmore deference. What couldn't all of these occasions for entry be qualified under the case law of the BIA as requiring that international connection? So the supervisor can come in and if the project is commissioned in Mexico or what have you, the litigation involves business affairs outside the United States. Your Honor, when you look at the regulation, especially you're looking at the FAM, you were looking at something that's given to a non-lawyer who's a consular official, and he looks at the application and he says, oh, it's coming for a convention, conventions are okay. That's it. What sort of guidance is that in the FAM if you're giving it to a consular official and you say, I'm not gonna tell you this, but the most important requirement that we're not even gonna write down is that you gotta be sure there's an international nexus. So if somebody is coming to a conference on international law, you let them in, but if he's coming to a conference on New York law, for example, you can't let them in because there's no international nexus. I mean, the FAM is supposed to be an everyday easy guide for the consular officials to apply when somebody comes with an application, they look at the application and they say, oh, this is what he's coming, I compare it to the list, he's okay. The FAM, however, is not a regulation. The FAM is not, but the FAM is an articulation of the government's position. It's some sort of guidance. It is a state department official document and insofar as we're talking about giving deference to the position that the executive branch has taken here, if the executive branch is speaking very differently in different contexts, it suggests that there is no deference, there is no deference to it. I think the deference to do is deference to the simple language of the statute. There's one more example, I see my time is up, but I wanna leave you with, which I see Judge Ginsburg is about to ask me a question. No. I'd asked the court to consider the Garavito case, which was a First Circuit case by now Justice then Judge Breyer, and it was a reversal. He reversed the old INS when it denied a B-1 visa to an individual who was coming in from Columbia to temporarily supervise a local gas station in Puerto Rico that he owned. He owned a corner gas station and the INS kept him out. And Judge Breyer said, this is a perfect B-1 visa. He's coming in, he's gotta do some things to arrange the gas station, the corner gas station that he owned. There was no discussion or requirement of an international nexus, there was none. And this was a case where Judge Breyer reversed the INS, wasn't accepting the fines there, he reversed the INS and found that the B-1 should have been recorded. The last point I'll make before I go is, I strongly disagree with the notion that the same word business in the statute can mean no international nexus for zone of interest purposes, but all of a sudden when you get to the merits, that same word in the same statute, because of something the BIA said would be, have to be read, according to Mr. Young, to include a international nexus. It cannot be that the same word means two different things at two different times. Mr. Royce, I had been preparing to ask you a question, but didn't want to interrupt you. Oh, okay. And the question was, how about an exclusion case? And you just gave it to me. Yes, the Garibedo case, yes. Thank you, Your Honor. And if I could just add, I'd like to end with a plea for the court to decide this case as quickly as the court could. I know that's an unusual plea to make, but I'm not kidding about the shortages that are out there. And this litigation, the sooner it is concluded, the sooner I hope we'll be in a position for our clients to go back in collecting the blood plasma that needs to be collected. Thank you, thank you very much. Any further questions? Thank you, counsel. We'll take the case under advisement.
judges: Rogers, Rao, Ginsburg